CHRISTOPHER J. CANNON, State Bar No. 88034
Sugarman & Cannon
737 Tehama No. 3
San Francisco, CA 94103
Telephone: (415) 362-6252
Facsimile: (415) 362-6431
chris@sugarmanandcannon.com

Attorney for Defendant,
Bruce CHOI.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>BRUCE CHOI,<br><br>Defendant. | Case No. 2:25-cr-00799-MWC-1<br><br>**NOTICE OF MOTION AND MOTION TO SUPPRESS DEFENDANT'S STATEMENTS AND EVIDENCE SEIZED FROM HIS LUGGAGE.**<br><br>Date: October 9, 2026<br>Time:10:00 a.m.<br>Honorable Judge Michelle Williams Court |

# TABLE OF CONTENTS

I. BACKGROUND ........ 1

II. A SHORT BITCOIN WALLET EXPLANATION ........ 8

III. ARGUMENT ........ 9

IV. THE RESULTS OF THE WARRANTLESS SEARCH OF MR. CHOI'S LUGGAGE AND SEIZURE OF THE BITCOIN WALLET MUST BE SUPPRESSED ........ 11

A. The Separation of Assets vs. Access Methods ........ 11

B. The Seizure Warrant vs. Search Warrant Distinction ........ 13

C. *Riley v. California* and the Heightened Protection for Digital Access Devices ........ 16

D. There Was No Consent To The Search ........ 17

CONCLUSION ........ 19

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*California v. Beheler*,
463 U.S. 1121, 103 S. Ct. 3517, 77 L. Ed. 2d 1275 (1983)....8

*Miranda v. Arizona*,
384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)....*passim*

*Riley v. California*,
573 U.S. 373, 134 S. Ct. 2473, 189 L. Ed. 2d 430 (2014)....15, 16

*In Re Search of One Address in Washington, D.C, Under Rule 41*
512 F. Supp. 3d 23 (D.D.C. 2021) ....14, 16, 17

*Snitko v. United States*,
*90 F.4th 1250* (9th Cir. 2024)....14

*Stansbury v. California*,
511 U.S. 318, 114 S. Ct. 1526, 128 L. Ed. 2d 293 (1994)....8

*Thompson v. Keohne*,
516 U.S. 99, 116 S. Ct. 457, 133 L. Ed. 2d 383 (1995)....8

*United States v. $557,933.89, More or Less, in U.S. Funds, Seized from Ramis Mercado-Filpo*,
287 F.3d 66 (2d Cir. 2002) ....11

*United States v. Albarado*,
495 F.2d 799 (2d Cir. 1974) ....11

*United States v. Bassignani*,
575 F.3d 879 (9th Cir. 2009) ....9

*United States v. Chandler*,
18 F. Supp. 2d 1240 (D. Kan. 1998)....13

*United States v. Craighead*,
539 F.3d 1073 (9th Cir. 2008) ....9, 10

*United States v. Place*,
462 U.S. 696, 103 S. Ct. 2637, 77 L. Ed. 2d 110 (1983)....11

*United States v. Reynoso*,
769 F. Supp. 3d 107 (D.P.R. 2025) (D.P.R. 2025)....15

*United States v. Robbins*,
21 F.3d 297 (8th Cir. 1994) ....................................................................................12

*United States v. Washington*,
387 F.3d 1060 (9th Cir. 2004) ....................................................................16, 17, 18

**Constitutional Provisions**

Fourth Amendment ....................................................................................*passim*

Fifth Amendment ....................................................................................1

Sixth Amendment ....................................................................................1

18 U.S.C. § 1343 ....................................................................................1

18 U.S.C. § 1957 ....................................................................................*passim*

**Other Authorities**

App. https://immi.homeaffairs.gov.au/visas/getting-a-visa/visa-listing/electronic-travel-authority-601 ....................................................................................2

Fed. R. Crim. P. 41(e)(2)(B) ....................................................................................14

https://www.bitstack-app.com/en/learn-bitcoin/understanding-bitcoin-addresses?c=EUR ....................................................................................7

https://trustwallet.com/blog/academy/what-is-a-seed-phrase-and-why-is-it-important, July 17, 2026. ....................................................................................7

*Protect It*. Patrick Dike-Nduleue, March 12, 2026 https://tangem.com/en/blog/post/private-key-simply-explained/?utm_source=google&utm_medium=cpc&utm_campaign=network:google|plt:pmax|sem:general|lngg:eng|country:eu_uk|name:1_plus_1|date:060526&utm_term=|&utm_content=cid:23819526921|adid:|gid:|tgid:|src:|dev:c|pn:|keyword:|mt:|expansion:|site:|csite:|devmod:|lockw:|locphy:9061268|nw:x&gad_source=1&gad_campaignid=23829362353&gbraid=0AAAAACWic4d34AuAg9QN8tZy2ZyFtoodB&gclid=CjwKCAjw4dDTBhAqEiwAkHYmSvracJv2ncA_69SN_nqMl5rdqSGES8oyRYA4sUKoNB-UURFaw0o4hRoCB3wQAvD_BwE ....................................................................................7

**NOTICE OF MOTION**

PLEASE TAKE NOTICE that on or about October 9, 2026, Defendant BRUCE CHOI, through counsel, hereby moves to suppress any and all incriminating statements, whether written or oral, and material seized through his warrantless detention on December 20, 2024. The Defense requests an evidentiary hearing on October 9, 2026, or another date at the convenience of the Court. This motion is based upon the Fourth, Fifth and Sixth Amendments to the Constitution, the argument made below, the entire file and record in this matter and any other material brought to the attention of the Court prior to a decision in this matter.

**MOTION**

## I. BACKGROUND

Bruce CHOI is charged in Counts One through Four with Wire Fraud Affecting a Financial Institution, in violation of 18 U.S.C. § 1343, and in Count Five with Transactional Money Laundering, in violation of 18 U.S.C. § 1957.

On Friday, December 20, 2024, Choi was leaving his apartment at [redacted] Wilshire Blvd in Los Angeles.[1] He was carrying a piece of carry-on luggage, containing a bitcoin hardware wallet inside a small mobile phone box. A picture of that luggage is attached as <u>Exhibit A</u>. Choi had called for an Uber, and a car was on the way to take him to the airport, Uber message attached as <u>Exhibit B</u>, where he and his sister had nonrefundable tickets on a Qantas Flight to Australia leaving at 9:20 pm. Copy of ticket information attached as <u>Exhibit C</u>. Choi's sister made the flight. Choi did not because, as he was leaving his apartment, he was detained by four-armed agents, interrogated, searched, and forced to turn over a hardware bitcoin

[1] We have attempted to redact all PII and will be happy to provide that information to the Court if desired.

wallet containing 19.56747569 BTC worth approximately $ 1,542,168.72 as of August 26, 2026. Although the government had a seizure warrant (attached as Exhibit H) for "all virtual currency held in the electronic wallet bearing address: bc1qync0rq89gq5jpqtnljmwg0sy3hgf6mqv0rmx6e," it did not have an arrest warrant for Choi, or a search warrant authorizing a search for an electronic wallet, the box the wallet was in, the hardware wallet it seized from Choi, nor the carry-on luggage that Choi had with him.

That interrogation was recorded and does not contain *Miranda* warnings.

The day prior to Choi's detention, the agents had come to his apartment building looking for Choi to interview him. Transcript USAO_1590[2], Exhibit L. But when he did not answer the door, they went to interview his sister, who lived in the same building. She told the agents that her family was going to Australia the next day, and she hoped Bruce was coming, but she thought he may have a problem with his visa.[3]

The armed agents returned the next day in the early evening, and again Special Agent J.J. Kasich said: "We're going to go interview Bruce Choi." Transcript USAO_1595, Exhibit N at 0:01-0:012, p.1.

---

[2] There are *three* separate transcripts of three audio recordings on December 19th and 20th, 2024. Those transcripts are described in and attached as Exhibits L, M, and N and authenticated by the contemporaneously filed Declaration of counsel.

The transcript USAO_0001590, Exhibit L, of the interrogation on December 20, 2024, is the most important and most cited transcript and will be simply referred to as "TX".

[3] She may have been misinformed about the Visa because all that is required for Americans to visit Australia is an ETA, or electronic visa, which can be obtained immediately by simply using an App. https://immi.homeaffairs.gov.au/visas/getting-a-visa/visa-listing/electronic-travel-authority-601 (Last accessed 7.31.26); and Choi had obtained a Visa on December 18, 2024. Exhibit J.

Again, Choi did not answer the door, but when he came out of his apartment to take his Uber to the airport, he was detained, searched, and interrogated. The Memorandum of that Interview is remarkably brief. It states only that:

> At the above listed date and time, and at the above listed location, the above listed special agents interviewed Bruce Choi and executed a seizure warrant for a hardware wallet[4] that contained cryptocurrency. The interactions between Choi and the special agents was audio recorded and a copy of that recording is attached to this memo.

Exhibit K, Memo of Interview (MOI); USAO_00001589.

While the MOI does not contain a specific date for the interrogation and seizure, it does indicate the interrogation took place from "Approximately 19:00 to 22:00." *Id.*

The computer file of that interrogation seems to be missing some time at the beginning of the interrogation because it begins with a discussion of jewelry. There is no indication that Choi was given a *Miranda* warning.

While the interrogation is long and rambling, it is clear that the agents told Choi that he was not free to leave, saying:

> [Choi] Is there a chance we can do it like after?
> [Interviewer 1] (12:56): No, it's gotta be right now.
> [Choi] (12:58): It's got to be right now?
> [Interviewer 1] : Yeah. I tried contacting you yesterday, earlier today. This is the first time I've been able to get ahold of you. I called you. Everything. We had security call you. We were trying to get ahold of you, so we didn't have to make you miss the flight. But this is the first time we've been able to contact you. So now we gotta do this. Right now. So, where is the wallet?

TX at 12:46-13:18, p.15.

---

[4] This description is an example of the agents' mischaracterization of the seizure warrant. That warrant authorized the seizure of for "all virtual currency held in the electronic wallet bearing address: bc1qync0rq89gq5jpqtnljmwg0sy3hgf6mqv0rmx6e. The warrant did not authorize the seizure of a hardware wallet such as the one seized by the agents.

The agents knew Choi had a plane to catch and played on his desire to catch that plane by telling him that:

> [Interviewer]: The quicker we do this, you...
> [Interviewer 1]: Yeah, you still... You have a chance to make it, but...That's because you got a carry on. So you don't have to check your bag.
> [Choi]: I mean, you're right about that.
> [Interviewer 1]:So, like, the faster we can do this, the faster you can get out. So where's the wallet?

TX at 13:24-13:38, p.15-16.

Choi told the agents he knew he was going to be interrogated because he had spoken to his sister about the agents' arrival at her door the prior day and he told the agents:

> [Choi] (18:02 - 18:28) Yeah. I was going to call you guys when I was, uh, on my way, essentially. You know, 'cause you -- what was that? -- um, 'cause I know -- 'cause I heard that you guys wanted to ask me questions. That's what I heard -- well, at least when my, uh -- when I talked to my sister, she said you were going to ask me questions. So that's how I knew. Um, but yeah. You guys were coming here in L.A. yesterday, you said?

TX at 18:02-18:28, p.23.

This statement is consistent with Choi's declaration that he did not feel free to go and had to answer the agent's questions. The agents did nothing to clear up Choi's misunderstanding of his legal rights. To the contrary, they exploited them.

There is no indication that the agents indicated Choi was free to go or gave him the required *Miranda* warning before the interrogation and seizure.

To the contrary, Choi told them that he had a flight and that an Uber was on the way, and the agents told him if he did not cooperate with them right now, he would be arrested, but that if he cooperated there was a chance he could catch his flight. See. Bruce Choi's Declaration attached.

The agents told Choi that if he did not cooperate, comply, and answer the questions they would put him in handcuffs and take him to a detention center; and he could not escape because there were police downstairs, he was under arrest and would be held unless he cooperated with them and that if he did cooperate with them, he would be able to catch the fight no problem at all. The agents told Choi he had no choice, should not make a scene, and should just cooperate now. Choi did as he was told, since he did not believe he had a choice.

The interview began with the agents confronting Choi with PPP loan documents and questioning him about the contents of those documents.

The agent asked:

"Are those numbers accurate on this form?" TX at 3:09 - 3:11 p.6.

"Do you remember filling that out?" TX at 3:21 - 3:38, p. 6.

"Is that how much you said the business made? Was that how much you were making?" TX at 4:24-4:37, pg.8.

"Yeah. Just look at the top. Is this your Social Security number right there?" TX at 5:03 - 5:05, p.8.

"Where did you bank at that time? TX at 5:25 - 5:43, p.8.

"Did you ever have a Chime account?" TX at 5:48-5:49, p.8.

The interrogation was interrupted when Choi got a message on his Uber app, which the agents noticed and led to Choi telling the agents: "I feel sorry for the guy." TX at 6:44 - 6:46, p.9.

To which the agents responded: "You can get another one real quick. Did he call you?" TX at 6:48 - 6:54, p.9.

To which Choi responded: "He says he'll be blocking traffic if he has to wait."

The agents did not react to the Uber information; they just continued to inquire:

> [Interviewer 1] Just, can you confirm your, uh, S—your signature on that? On the back page?
> [Choi] This one right here?
> [Interviewer 1] Yeah.
> [Choi] Signature? Um, it says my name on it.

TX at 6:59-7:03, p.10.

The interrogation continued with the agent asking:

> [Interviewer 1]: So in May of 2020, you got the loan for 1.9 million dollars from the PPP loan. Correct?. . . .And wh-what did you do with the money. . . Okay. Invest it? [...]
> I keep showing you documents. I kind of know the answers. I'm-I'm asking questions to. So, like, you moved the money to Prime Trust. Right? To Binance? [..] The 2 million? Or at least part of it?

TX at 8:08-10:13, p.11-13.

Choi again tried to terminate the interview saying: I would prefer to do this after […] TX at 10:41-10:46, p. 13.

And again, the agent just continued the questioning, asking: "But 7-you guys were—you were talking to Binance. Right?" TX at 20:46 p. 13.

Significantly, the agents did not even mention they had a seizure warrant until 12 minutes into the recording. And when the agents told Choi they had a warrant, they mischaracterized the seizure warrant for bitcoin as a seizure warrant for the wallet, rather than a seizure warrant for bitcoin at a particular address, telling Choi that:

> I know you moved twenty bitcoin into a wallet. A self-custody wallet. And I have a seizure warrant here for that wallet.

TX at 10:54-12:30, p. 14.

In fact, the agents did not have any type of warrant for a self-custody wallet. They only had a seizure warrant for: "All virtual currency held in the electronic wallet bearing address: be 1 qync0rq89gq5jpqtnljmwg0sy3hgf6mqv0rmx6e." <u>Exhibit H</u>, Seizure Warrant USAO_00001702.

The agents then told Choi: "Help me get that bitcoin. Right now. I need. I need your help." TX at 10:54 - 12:30, p.15.

Choi again indicated he would "like to do it after" (he returned from Australia) and the agent told him:

> [Interviewer 1] Nah. It's gotta be right now."
>
> [Choi]: It's gotta be right now?
>
> [Interviewer 1]: Yeah. I tried contacting you yesterday, earlier today. This is the first time we've been able to get a hold of you. I called you, everything. We had security call you. We were trying to get a hold of you, so we didn't have to make you miss the flight. But this is the first time we've been able to contact you. So now we've got to do this thing right now [..] So where is the wallet?"

TX. at 12:58 - 13:18, p.15

Choi was clearly in custody since he was prevented from taking his Uber to the airport and getting on with his previously planned trip. The agents told him he had to talk to them "right now." Choi did not know he had the right to remain silent or decline to answer questions. By the time the interrogation was over, Choi's plane had already departed.

After the agents told Choi they had a seizure warrant for the wallet, they told him: (timestamps) "The faster we can do this, the faster you can get out. But where's the wallet?" TX. At 13:34, p. 16.

The agent asked: "[What…] Do you have it on you?" TX at 13:57 - 13:58, p.16

And Choi responded (13:58) "Yeah, it's here." referring to his suitcase. *Id.*

As requested, Choi began to open his suitcase, slowly, because "I'm sorry. Yeah, you guys have guns, right?", TX 14:02-14:05, p.16, and he said "So I will do it slow. […] I will do it very, very, very, slow […] I will not make any fast moves." TX at 14:07-14:11, p.17. The female agent interrupted and asked if she could open it instead. TX at 14:42. P. 18. She opened the

suitcase, searched it, found a box containing a hardware wallet, and with Choi's help, accessed the bitcoin in that wallet.

## II. A SHORT BITCOIN WALLET EXPLANATION

Bitcoin is a digital currency represented by an entry on the blockchain.[5]

Even though bitcoins exist on the blockchain, individuals generally store the information that allows them to access their bitcoin in wallets. When a crypto wallet is created, the wallet software uses a random number generator to create a seed phrase, which is then used to generate a private key. Once the private key exists, the public key is derived from that private key using elliptic curve cryptography (ECC) to create an alphanumeric wallet address that can be used to receive funds.

A bitcoin wallet address is similar to a mailing address that is used to receive mail. Unlike a postal address, however, which remains the same for all letters received, bitcoin wallets can generate multiple receiving addresses

Once bitcoins are received at an address, the only way to move them again is to provide proof of ownership with the corresponding private key or the seed phrase.

---

[5]This information is taken from *What is a Private Key, How it Works, and How to Protect It*. Patrick Dike-Nduleue, March 12, 2026 https://tangem.com/en/blog/post/private-key-simply-explained/?utm_source=google&utm_medium=cpc&utm_campaign=network:google|plt:pmax|sem:general||lngg:eng|country:eu_uk|name:1_plus_1|date:060526&utm_term=|&utm_content=cid:23819526921|adid:|gid:|tgid:|src:|dev:c|pn:|keyword:|mt:|expansion:|site:|csite:|devmod:|lockw:|locphy:9061268|nw:x&gad_source=1&gad_campaignid=23829362353&gbraid=0AAAAACWic4d34AuAg9QN8tZy2ZyFtoodB&gclid=CjwKCAjw4dDTBhAqEiwAkHYmSvracJv2ncA_69SN_nqMl5rdqSGES8oyRYA4sUKoNB-UURFaw0o4hRoCB3wQAvD_BwE (Last accessed 8.6.26).

And Everything you need to know about Bitcoin addresses: https://www.bitstack-app.com/en/learn-bitcoin/understanding-bitcoin-addresses?c=EUR (Last accessed 8.6.26.).

*What is a seed phrase, and why is it important?* Published on January 17, 2025; updated on July 17, 2026. https://trustwallet.com/blog/academy/what-is-a-seed-phrase-and-why-is-it-important

Since the blockchain is public, it is easy to see which addresses secure what quantity of bitcoins.

If the crypto owner loses a hardware wallet or forgets the address or password to a software wallet, the owner can use the seed phrase to recover his wallet and access his crypto.

## III. ARGUMENT

*Miranda* warnings are required when a person is subjected to custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966) defined custodial interrogation as questioning initiated by law enforcement after a person has been taken into custody or otherwise deprived of freedom of action in any significant way. The Supreme Court has consistently held that the ultimate inquiry is whether there was a restraint on freedom of movement of the degree associated with a formal arrest. *California v. Beheler*, 463 U.S. 1121, 103 S. Ct. 3517, 77 L. Ed. 2d 1275 (1983); *Stansbury v. California*, 511 U.S. 318, 114 S. Ct. 1526, 128 L. Ed. 2d 293 (1994). The test is objective: courts examine the totality of the circumstances surrounding the interrogation and ask whether a reasonable person in the suspect's position would have felt free to terminate the interrogation and leave. *Thompson v. Keohne*, 516 U.S. 99, 116 S. Ct. 457, 133 L. Ed. 2d 383 (1995).

The Ninth Circuit applies a five-factor test to the custody determination, examining: (1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual. *United States v. Bassignani*, 575 F.3d 879 (9th Cir. 2009)(citing *United States v. Kim*, 292 F.3d 969 (9th Cir. 2002)).

These factors are non-exhaustive; other circumstances may be pertinent to and even dispositive of whether a reasonable person would have believed they could freely walk away.

*United States v. Bassignani*, 575 F.3d 879 (9th Cir. 2009). The Ninth Circuit frames the ultimate question as whether a reasonable person in such circumstances would conclude that after brief questioning he or she would not be free to leave. *United States v. Bassignani*, 575 F.3d 879 (9th Cir. 2009).

The custody determination is a mixed question of law and fact reviewed de novo on appeal by federal appellate courts, while the underlying factual findings are reviewed for clear error. *Id*.

In *United States v. Craighead*, 539 F.3d 1073 (9th Cir. 2008), the Ninth Circuit held that when the circumstances transform the familiar home surroundings into a police-dominated atmosphere, custody exists. The court identified four relevant factors:

> (1) the number of law enforcement personnel and whether they were armed;
>
> (2) whether the suspect was at any point restrained, either by physical force or by threats;
>
> (3) whether the suspect was isolated from others, which the court identified as perhaps the crucial factor; and
>
> (4) whether the suspect was informed that questioning was voluntary and that he was free to leave or terminate the interview.

*United States v. Craighead*, 539 F.3d 1073 (9th Cir. 2008).

In *Craighead*, eight-armed officers from three agencies entered the home; the defendant was escorted to a back storage room with an officer blocking the door, and he was isolated from a support person—these facts established custody even though the defendant was told he was free to leave. *Id*.

Here, there were four-armed officers, and Choi was told there were additional police downstairs. Choi knew they were there to question him because his sister had told him of the attempt on the prior day. Choi did not understand that he did not have to speak to the agents. The tape itself shows that he believed he had to talk to the agents. The first 12 minutes of the interrogation consist of the agents confronting Choi with documents as evidence of his guilt and

asking Choi to explain those documents. Choi was told he had to cooperate. He asked if he could do this later. He was told he had to answer questions right now. No reasonable person with non-refundable tickets would want to miss even a day of their highly anticipated family trip to visit a new country for the first time. He was not free to go and was specifically told that the process would take some time. He was not given a *Miranda* warning.

Accordingly, his statements and the fruits of that statement must be suppressed.

## IV. THE RESULTS OF THE WARRANTLESS SEARCH OF MR. CHOI'S LUGGAGE AND SEIZURE OF THE BITCOIN WALLET MUST BE SUPPRESSED

The Fourth Amendment requires that a warrant particularly describes both the place to be searched and the things to be seized. A warrant describing only the asset to be seized, such as a quantity of bitcoin, does not describe any physical location or container to be searched. Just as a warrant to seize funds in a bank does not authorize the search and seizure of all employees and containers in that bank, a warrant that authorizes seizure of a digital asset does not, by implication, authorize a physical search of every container the suspect might be carrying to find the means of accessing that asset.

### A. The Separation of Assets vs. Access Methods.

A warrant authorizing the seizure of a digital asset is legally distinct from a warrant authorizing a search for the *means of access*. If the supporting affidavit fails to provide a specific factual nexus showing that a seed phrase or hardware wallet is located inside a particular bag or container, searching that container violates the Fourth Amendment.

In *United States v. Place*, 462 U.S. 696, 103 S. Ct. 2637, 77 L. Ed. 2d 110 (1983), the Supreme Court held that "in the ordinary case, the Court has viewed a seizure of personal property as per se unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly

describing the items to be seized." Luggage and personal bags are paradigmatic examples of personal property in which individuals retain a strong expectation of privacy.

In *United States v. Albarado*, 495 F.2d 799, 802-03 (2d Cir. 1974), the Second Circuit held that searches of carry-on luggage constitute "searches" within the meaning of the Fourth Amendment. The Second Circuit reaffirmed this principle in *United States v. $557,933.89, More or Less, in U.S. Funds, Seized from Ramis Mercado-Filpo*, 287 F.3d 66, 80-81 (2d Cir. 2002), rejecting the government's argument that airline passengers have no reasonable expectation of privacy in their carry-on luggage.

Here, the closed luggage was in Choi's possession, and he was told he had to open it.

A government seizure warrant for cryptocurrency at a particular address — standing alone — does not authorize searching a person's physical luggage, bags, or containers to locate a hardware wallet, seed phrase, or other access device. Under well-established Fourth Amendment doctrine, a warrant must particularly describe the place to be searched and the items to be seized. A warrant that identifies only a specific cryptocurrency wallet address does not, by its terms, authorize a physical search of luggage or containers for the physical instruments needed to access that asset.

To lawfully search luggage for a hardware wallet or seed phrase, the government must either" (1) obtain a separate search warrant specifically describing the physical location to be searched and the physical items to be seized, or (2) rely on a properly drafted combined warrant that explicitly authorizes both the seizure of the cryptocurrency and the physical search for access devices. Absent such explicit authorization, a physical search of luggage constitutes an unreasonable search under the Fourth Amendment. *United States v. Robbins*, 21 F.3d 297 (8th Cir. 1994) is the most directly analogous precedent. In that case, police executed a search warrant

at a business and seized the defendant's wallet, later discovering incriminating documents inside it.

The Eighth Circuit held that the seizure violated the Fourth Amendment because the wallet itself was not described in the warrant. The court articulated the governing rule:

> A search warrant does not give police license to seize personal property not described in the warrant on the ground that such property might contain items that the warrant does describe; it only allows police to search such property at the place where the warrant is being executed if the property "legitimately might contain the [items] specified in the warrant," and then to seize the described items they find inside or, under certain circumstances, the property itself once it is found to contain described items.

*United States v. Robbins*, 21 F.3d 297 (8th Cir. 1994)

The court explicitly rejected the government's argument that "because the warrant authorized officers to search inside the wallet, it also authorized them to seize the wallet," calling this "a fundamental misapprehension of Fourth Amendment law."

The *Robbins* framework enlightens the situation here. A cryptocurrency seizure warrant authorizes the government to take control of the digital asset. It does not authorize agents to seize a person's luggage, open it, and rummage through it to look for a hardware wallet that may be used to obtain the specified bitcoin unless that physical item was specifically described in the warrant as an item to be searched, or unless the warrant also authorizes a search of the specific physical location where they are stored.

**B. The Seizure Warrant vs. Search Warrant Distinction.**

A critical threshold issue is the distinction between a warrant authorizing the *seizure* of specific property and a warrant authorizing a *search* for that property.

In *United States v. Chandler*, 18 F. Supp. 2d 1240 (D. Kan. 1998), the court held that “a seizure warrant cannot be used as a general search warrant” and that to do so would constitute the sort of "exploratory rummaging" barred by the Fourth Amendment.

The court acknowledged that “the authority to seize an item involves some authority to search for the item but emphasized that this incidental search authority is strictly limited — it does not extend to unspecified locations or containers. *Id.* A warrant that requests authority to search for items to seize without identifying those items with particularity violates the Fourth Amendment. *Id.*

This principle applies directly to cryptocurrency seizure warrants. When the government obtains a warrant to seize specific bitcoin — identified, for example, by its blockchain address — that warrant authorizes the government to take control of the digital asset at that address. It does not, without more, authorize agents to search a person's physical luggage to locate the hardware wallet, Ledger device, Trezor device, seed phrase card, or other physical access credential needed to execute the transfer. The digital asset and the physical access device are legally distinct objects. The seizure warrant describes only the crypto stored at a particular address. It does not describe the hardware wallet that was in Choi’s suitcase.

In *Snitko v. United States, 90 F.4th 1250* (9th Cir. 2024), the Ninth Circuit addressed the difference between a warrant to seize items and the search of the seized items. There, the FBI obtained a warrant to seize the nests of safe deposit boxes at a private vault company. The warrant did not authorize a criminal search or seizure of the contents of the safety deposit boxes, even though the warrant referred to normal inventory procedures. The Ninth Circuit held that the government exceeded the scope of the warrant by conducting a criminal search of the boxes' contents without obtaining a separate warrant, even though agents had probable cause to believe criminal proceeds would be found inside. The intrusion in this case is much worse because the

seizure warrant here only authorized the seizure of bitcoin at a particular address. There was no warrant authorizing the search of Choi's luggage and hardware wallet. Nevertheless, the agent falsely told Choi he had a warrant for the hardware wallet.

Here, the closed luggage, containing a box, containing a bitcoin wallet, was in Choi's possession, and he was told he had to allow it to be searched.

Fed. R. Crim. P. 41(e)(2)(B) outlines the procedure for warrants seeking "electronically stored information" or data. "A warrant under Rule 41(e)(2)(A) may authorize the seizure of electronic storage media or the seizure or copying of electronically stored information. Unless otherwise specified, the warrant authorizes a later review of the media or information consistent with the warrant."

Accordingly, the agents could have obtained a warrant to seize Choi's hardware wallet, which is a piece of electronic storage media, but they did not. The warrant only authorized the seizure of virtual currency held at a particular address.

Although there is not an abundance of authority discussing crypto seizure warrants, two district court opinions demonstrate how the government can obtain a warrant that authorizes both the seizure of cryptocurrency and the physical search for access devices. In *In Re Search of One Address in Washington, D.C.*, Under Rule 41, 512 F. Supp. 3d 23 (D.D.C. 2021), a magistrate judge approved a cryptocurrency warrant that explicitly authorized the seizure of "all unhosted wallets and any information used to access hosted or unhosted cryptocurrency wallets," including "wallet recovery seeds, and usernames, passwords, mnemonic pins, PGP keys and 2FA devices. *Id.* at n. 6.

Warrants like this show that the government can and should obtain explicit authorization for physical access devices when it anticipates needing them. No such warrant was obtained here.

In *United States v. Reynoso,* 769 F. Supp. 3d 107 (D.P.R. 2025) (D.P.R. 2025), the defendant was held in contempt after his counsel received a warrant authorizing the seizure of bitcoin. That warrant contained specific language that: “the subject shall not obstruct, impede, or interfere with the seizure of the SUBJECT ASSETS.” “It also command[d] that he transfer the 119.65 BTC to a specific government-controlled wallet.” *United States v. Reynoso*, 769 F. Supp. 3d 107, 118 (D.P.R. 2025), modified, 814 F. Supp. 3d 262 (D.P.R. 2026)

This warrant contained no such language requiring Choi to assist in the seizure.

**C. *Riley v. California* and the Heightened Protection for Digital Access Devices.**

The Supreme Court's landmark decision in *Riley v. California*, 573 U.S. 373, 134 S. Ct. 2473, 189 L. Ed. 2d 430 (2014) reinforces this analysis.

In *Riley*, the Court held that police generally may not, without a warrant, search digital information on a cell phone seized incident to arrest. The Court reasoned that cell phones contain “immense storage capacity” and that “many of the more than 90% of American adults who own a cell phone keep on their person a digital record of nearly every aspect of their lives,” and that the traditional justifications for warrantless searches — officer safety and evidence preservation — do not apply to digital data. *Riley v. California*, 573 U.S. 373, 134 S. Ct. 2473, 189 L. Ed. 2d 430 (2014). The Court's analysis emphasized that digital data stored on cell phones receives heightened Fourth Amendment protection and the police should: “get a warrant.” *Id.* A hardware wallet is, in essence, a physical key to a person's cryptocurrency holdings stored on the blockchain.

Under *Riley*'s reasoning that digital devices containing extensive personal information require heightened Fourth Amendment protection, the mere fact that the government has a warrant to seize the cryptocurrency does not mean it has the authorization to search for the physical key — the hardware wallet or seed phrase — in a person's luggage without additional warrant

authority. The hardware wallet itself is a digital device containing private cryptographic keys; its contents are entitled to the same heightened Fourth Amendment protection that *Riley* extended to cell phones. Even if agents lawfully seize a hardware wallet under a properly described warrant, they would need separate authority to access its contents.

**D. There Was No Consent To The Search.**

The government may try to contend that Bruce Choi consented to the search of his luggage and hardware wallet. That argument fails because any alleged consent was the project of the initial, illegal detention and interrogation.

This case is much like *United States v. Washington*, 387 F.3d 1060, 1072 (9th Cir. 2004), where the Ninth Circuit reversed a district court after finding that any alleged consent was tainted by the illegal seizure, stating:

> Under the Fourth Amendment, "evidence obtained subsequent to an illegal investigation is tainted by the illegality and thus inadmissible, notwithstanding. . . .consent, unless subsequent events have purged the taint. " *United States v. Bautista*, 362 F.3d 584, 592 (9th Cir.2004) (quoting *United States v. Chavez–Valenzuela*, 268 F.3d 719, 727(9th Cir.2001), *amended by*, 279 F.3d 1062 (2002), and holding that "consent was tainted and the evidence obtained pursuant to it should have been suppressed"); *see also United States v. Hotal*, 143 F.3d 1223, 1228 (9th Cir.1998) ("Consent to search that is given after an illegal entry is tainted and invalid under the Fourth Amendment.").

*United States v. Washington*, 387 F.3d 1060, 1072 (9th Cir. 2004)

In *Washington*, a suspected meth cooker was confronted by six officers in the hallway of his apartment and thrice told that he was facing an arrestable charge of failing to register with the police. As in this case, Washington was never told he had a right to refuse to answer questions or terminate the encounter. The Ninth Circuit held that Washington's alleged consent was vitiated

by the initial illegal detention and suppressed Washington's statements and a gun found in his room. The facts in this case are even more egregious.

The officers knew Choi had a plane to catch and used that information to induce him to cooperate, telling him that he had to do this right now, and if he cooperated, he might be able to catch his plane.

The contents of the interrogation demonstrate that Choi thought he had to talk to the agents. The agents told Choi:

> I know you moved 20 Bitcoin into a wallet -- a self-custody Wallet -- and I have a seizure warrant here for that wallet. So I'm here to get that Bitcoin from you.
> TX. at 10:54-12:30, p. 14.

After Choi said "Okay," the agent repeated:

> So, here's the seiz-, here's the warrant, signed by a judge. This is your copy. And I need you to help me get that Bitcoin right now. I need, I need your help. *Id.*

Choi indicated he heard what the agent was saying and asked: (12:46 - 12:56) "I mean... Okay, I see what you're saying. Is there a chance we can do it like after?" TX at 12:46-12:56, p. 15.

The agents responded: "No, it's gotta be right now." TX at 12:56-12:59, p. 15.

Choi asked again: (12:58 - 12:59) "It's gotta be right now?" *Id.*

And the agent told him because they had been unable to contact him yesterday " So now we gotta do this. Right now […] So, where is the wallet?" TX at 12:56-12:59, p. 15.

/

/

/

When Choi asked if he could do this when he came back, the officers just continued to interrogate[6]. The officers misrepresented the scope of the warrant, telling Choi:

> I know all of -- like, I followed all the money. All right? So what I have here is that I know you moved 20 Bitcoin into a wallet -- a self-custody wallet -- and I have a seizure warrant here for that wallet. So I'm here to get that Bitcoin from you.

TX. at 10:54 - 12:30, p.14.

As indicated above, there was no seizure warrant for any wallet. There was only a seizure warrant for the virtual currency held in a particular wallet bearing the address: "be1qync0rq89gq5 jpqtnljmwg0sy3hgf6mqv0rmx6e."

This was simply an unwarranted search as a result of an illegal detention and interrogation, and the results of that search must be suppressed.

## CONCLUSION

Based on the foregoing, the defense respectfully requests that the Court grant this Motion and exclude any and all of Bruce Choi's alleged incriminating statements, whether written or oral, in their entirety; as well as the bitcoin fruit of the *UnMirandized* statement and unwarranted detention and search.

Date: August 28, 2026

s/ Christopher J. Cannon
Christopher J. Cannon
Counsel for Bruce CHOI

---

[6] Similarly, earlier in the conversation, Choi told the agents, "I would prefer to do this after," but they ignored his request and just continued with their questioning. TX at 10:41 - 10:46, p.13.